## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| C.A., K.P., R.K. and T.H., | CIVIL ACTION FILE |
| Plaintiffs, | |
| | NO. |
| v. | |
| | JURY TRIAL DEMANDED |
| Extended Stay America, Inc.; ESA Management, LLC; and HVM, LLC, | Pursuant to Fed. R. Civ. P. 38 |
| Defendants. | |

## **COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................. 1

JURISDICTION & VENUE ................................................................. 6

THE PARTIES .................................................................................... 6

  I.  THE PLAINTIFFS ....................................................................... 6

  II. THE DEFENDANTS ................................................................... 7

      A.    Identity of Defendants ...................................................... 7

      B.    Relationships Among the Defendants .................................. 8

FACTUAL ALLEGATIONS .............................................................. 11

  I.  NUMEROUS SIGNS OF PLAINTIFFS' TRAFFICKING SHOULD
      HAVE BEEN OBVIOUS TO DEFENDANTS. ................................... 11

  II. PLAINTIFFS WERE EACH SOLD FOR SEX AT THE ESA
      ATLANTA LOCATIONS AND ESA BATON ROUGE. .................... 15

      A.    The Trafficking of C.A. at ESA hotels .................................. 19

      B.    The Trafficking of K.P. at ESA hotels .................................. 22

      C.    The Trafficking of R.K. at ESA hotels .................................. 24

      D.    The Trafficking of T.H. at ESA hotels. .................................. 26

  III.DEFENDANTS KNEW OR SHOULD HAVE KNOWN SEX
      TRAFFICKING AND PROSTITUTION WERE OCCURRING. ...... 28

      A.    The trafficking and prostitution activity at ESA hotels
          was open and obvious. ....................................................... 29

      B.    Publicly available reviews confirmed the prevalence of
          commercial sex and other criminal activity at the ESA
          hotels. ............................................................................. 32

      C.    The Defendants knew or should have known about arrests
          and criminal activity at the ESA hotels. ................................ 44

CLAIMS FOR RELIEF ..................................................................... 54

  I.  VIOLATIONS OF THE GEORGIA RACKETEER INFLUENCED
      AND CORRUPT ORGANIZATIONS ACT .................................... 54

**A.**      **Defendants engaged in acts of racketeering activity.**........ 54

     **1.**      **Keeping a Place of Prostitution.**................................... 54

     **2.**      **Aiding and Abetting Prostitution.** ............................. 55

     **3.**      **Aiding and Abetting Pimping.**...................................... 55

     **4.**      **Sexual Servitude in Violation of State Law.**............... 56

**B.**      **The acts of racketeering activity formed a pattern.**........... 59

**II. NUMBERED COUNTS** ............................................................. 62

     **COUNT I** ................................................................................ 62

     **COUNT II** ............................................................................... 64

     **COUNT III** ............................................................................. 66

     **COUNT IV**............................................................................... 73

**III. ADDITIONAL THEORIES OF RECOVERY** ..................................... 80

     **ALTER EGO** ........................................................................... 80

     **JOINT VENTURE** ................................................................... 81

COMES NOW Plaintiffs in the above-styled action and hereby file their Complaint as follows:

## INTRODUCTION[1]

1.     Plaintiffs C.A., K.P., R.K., and T.H. are sex trafficking victims who were sold for sex at one of at least a dozen Extended Stay America ("ESA") hotels around the Atlanta, Georgia area and in Baton Rouge, Louisiana. Plaintiffs each suffered physical, emotional, and sexual abuse while Defendants  Extended Stay America, Inc., ("ESA, Inc.") ESA Management, LLC, and HVM, LLC (collectively "Defendants") profited from the money paid for room rentals by Plaintiffs' traffickers and buyers.

2.     The ESA at 1967 Leland Drive, Marietta, Cobb County, Georgia 30067 was the first place Plaintiffs R.K. and T.H. were sold for sex, but it would not be the last.  R.K. was 17 years old.  T.H. was 16 years old.

3.     The ESA at 2010 Powers Ferry Road, Atlanta, Cobb County, Georgia 30339 was described by a reviewer as "[s]omewhere between a brothel and a battered women's shelter."  Plaintiffs C.A., K.P., and R.K. were all trafficked at this ESA.

4.     The manager of the ESA at 3967 Peachtree Road, Brookhaven, DeKalb

---

[1] Paragraphs in the Introduction, Jurisdiction and Venue, and Parties sections apply to all claims and all Plaintiffs.  Unless otherwise noted, the same is true for paragraphs in the Factual Allegations section.

County, Georgia 30319 coordinated with C.A. and K.P.'s trafficker to help him avoid police and maximize his profits.

5.     The sex trafficking business at the ESA at 1050 Hammond Drive, Atlanta, Fulton County, Georgia 30328 was so brisk that a front desk employee started a side-hustle—selling lingerie from a box he kept under the hotel desk.

6.     These were not isolated incidents, and these ESA hotels were not an aberration.  ESA hotels around the Atlanta area were known among sex traffickers and their victims as places they could go and not only avoid getting caught but, in many cases, find assistance and support from the hotel's employees.  These employees aided and abetted the commercial sex trafficking happening at the location by, among other things, providing advice, encouragement, cover, and counsel, as well as serving as lookouts.

7.     Plaintiffs C.A., K.P., R.K., and T.H.'s traffickers and the gang of traffickers with whom they associated preferred ESA hotels.  In fact, while Plaintiffs' traffickers moved from hotel to hotel, they frequently chose to base their criminal sex trafficking operations at one of at least a dozen ESA locations around Atlanta and at an ESA in Baton Rouge, Louisiana.[2] Plaintiffs' traffickers selected ESAs for a simple reason—selling victims from

---

[2] 6250 Corporate Boulevard, Louisiana 70809 ("ESA-Baton Rouge").

ESA hotel rooms was easy, safe for traffickers, and profitable.

8.      Profit is also the reason why Defendants' hotel employees did not merely ignore obvious sex trafficking at its hotels but instead went so far as to welcome the traffickers, victims, and the revenue that trafficking generated.  Defendants' policies and procedures facilitated systemic criminal conduct while hotel employees with actual knowledge of sex trafficking assisted trafficking operations.

9.      Defendants are responsible for a pattern of illegal conduct that is connected in time and occurred in close geographic proximity.  The conduct took place over for at least eight years and permeated Defendants' operation of at least a dozen hotels around Atlanta—all within 18 miles of each other (the "ESA Atlanta locations"), and several within a 1.5 mile radius.  Two of the ESA Atlanta locations were just 0.05 miles apart.

10.     The ESA Atlanta locations include, but are not limited to:

- 2010 Powers Ferry Road, Atlanta, Georgia, 30339 ("ESA-2010 Powers Ferry")

- 2239 Powers Ferry Road, Atlanta, Georgia, 32067 ("ESA-2239-Powers Ferry")

- 3115 Clairmont Road, Atlanta, Georgia, 30329 ("ESA-Clairmont")

- 905 Crestline Parkway, Atlanta, Georgia, 30328 ("ESA-Crestline")

- 2474 Cumberland Parkway, Atlanta, Georgia, 30339

("ESA-Cumberland")

- 1050 Hammond Drive, Atlanta, Georgia 30328
  ("ESA-Hammond")

- 2225 W. Interstate North Parkway, Atlanta, Georgia 30339
  (ESA-W. Interstate")

- 6330 Peachtree Dunwoody Road, Atlanta, Georgia 30328
  ("ESA-Peachtree Dunwoody")

- 3967 Peachtree Road NE, Atlanta, 30319
  ("ESA-Peachtree Road")

- 1967 Leland Drive, Marietta, Georgia, 30067
  ("ESA-Leland")

- 3331 Old Milton Parkway, Alpharetta, Georgia, 30005
  ("ESA-Old Milton")

- 7065 Jimmy Carter Boulevard, Norcross, Georgia 30092
  ("ESA-Jimmy Carter")

11.   The trafficking of Plaintiffs at the ESA Atlanta locations and the ESA-Baton Rouge spans at least eight years and involves Plaintiffs and numerous other victims known to them and with whom they were trafficked.  While at ESA hotels, Plaintiffs also witnessed other victims whom Plaintiffs did not personally know, but whom Plaintiffs easily recognized as trafficking victims.

12.   Plaintiffs C.A., K.P., R.K., and T.H. are trafficking victims who were openly sold for sex at the ESA Atlanta locations.  Plaintiffs file this lawsuit to seek redress from Defendants under federal and state law.

13.   Defendants participated in a venture that consisted of the operation of

the ESA Atlanta locations and ESA-Baton Rouge.  Employees at these hotels assisted sex traffickers by, for example, warning them if law enforcement were nearby and otherwise providing a safe harbor for the trafficking to continue.  Others turned a blind eye to Plaintiffs' trafficking in exchange for the rental rate of a hotel room.  This conduct violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591(a) and (d).  And because Defendants knew or should have known about this conduct but continued to reap the benefits of the ESA Atlanta locations and ESA-Baton Rouge anyway, they are liable to Plaintiffs under 15 U.S.C. § 1595(a).

14.    Defendants knowingly permitted the ESA Atlanta locations to be used for prostitution in violation of Georgia law.  Because Plaintiffs are sex trafficking victims who were injured by Defendants' keeping places of prostitution and related offenses, Defendants are also liable to Plaintiffs under the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO").

15.    Further, Defendants breached duties imposed by law, assumed by contract, and voluntarily undertaken by them, and because Defendants knew or should have known of the foreseeable risk of sex trafficking, prostitution, and other crimes at the ESA Atlanta locations, Defendants are liable to Plaintiffs for their negligence under Georgia law.

## JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction over this lawsuit pursuant to

28 U.S.C. § 1331 because Plaintiffs assert claims arising under 18 U.S.C.

§ 1595(a), and pursuant to 28 U.S.C. § 1367 because Plaintiffs' state law

claims form part of the same case or controversy as their federal law claims.

17.     Defendants are subject to personal jurisdiction in this district and

division.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a

substantial part of the events or omissions giving rise to the claims asserted

in this action occurred in the judicial district where this action is brought.

## THE PARTIES

## I.     THE PLAINTIFFS

19.     Plaintiffs, proceeding anonymously,[3] are victims of sex trafficking at

multiple ESA locations in and around Atlanta, Georgia and Baton Rouge,

Louisiana.

20.     C.A. is a citizen of the United States of America and a resident of the

State of Georgia.  From approximately 2009 through 2015, Plaintiff C.A. was

---

[3] At the earliest possible time, Plaintiffs will file a Motion for Protective
Order and Leave to Proceed Anonymously based on the intimate and
personal nature of the complaint's allegations, as well as for their own
personal safety.  While that motion is pending, Plaintiffs will provide their
identity to counsel for Defendants upon the resolution of that motion and
agreement upon a protective order.

trafficked for sex at multiple ESA locations, as further described below.

21.    K.P. is a citizen of the United States of America and a resident of the State of Nebraska.  From approximately 2010 through 2017, Plaintiff K.P. was trafficked for sex at multiple ESA locations, as further described below.

22.    R.K. is a citizen of the United States of America and a resident of the State of Texas.  From approximately 2009 through 2013, Plaintiff R.K. was trafficked for sex, at times while she was a minor, at multiple ESA locations, as further described below.

23.    T.H. is a citizen of the United States of America and a resident of the State of Texas.  From approximately 2009 through 2011, Plaintiff T.H. was trafficked for sex as a minor at multiple ESA locations, as further described below.

## II.    THE DEFENDANTS

### A.    Identity of Defendants

24.    Extended Stay America, Inc., identified throughout this complaint as "ESA, Inc.," is a corporation organized under the laws of Delaware with its principal place of business in Charlotte, North Carolina.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. ESA, Inc. may be served with process by serving its registered agent,

National Registered Agents, Inc. 1209 Orange Street, Wilmington, DE, 19801.

25.    ESA Management, LLC ("ESA Management") is a limited liability company organized under the laws of Delaware with its principal place of business in Charlotte, North Carolina.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  ESA Management may be served with process by serving its registered agent, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, GA, 30046-4805.

26.    HVM, LLC ("HVM") was a limited liability company organized under the laws of Delaware with its principal place of business in Charlotte, North Carolina. Until November 2013, it regularly conducted business in the State of Georgia, derived substantial revenue from services rendered in Georgia, and committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. HVM may be served with process by serving its registered agent, National Registered Agents, Inc., 1209 Orange Street, Wilmington, DE, 19801.

### B.    Relationships Among the Defendants

27.    Defendant ESA, Inc., is a publicly traded company that describes itself as "the largest integrated hotel owner/operator in North America."  Today,

#3161866v12

8

ESA, Inc. manages 650 hotels and describes itself as "the leading brand in the mid-priced extended stay segment, with approximately twice as many rooms as its nearest competitor." While it owns and operates its hotels through a number of subsidiaries, during the relevant time period, ESA, Inc. was the ultimate owner and operator each of the hotel locations that are the subject of this suit.

28.     For example, Defendant ESA, Inc., is the parent company of, among other entities, ESA P Portfolio, LLC, a company through which it owns the real property for its hotels. Similarly, ESA, Inc., is the parent company of, among other entities, ESA P Portfolio Operating Lessee, LLC, a company that leases the real property for Extended Stay America hotels from ESA P Portfolio.

29.     Additionally, Defendant ESA, Inc., is the parent company of Defendant ESA Management, the entity that manages Extended Stay America-branded hotels, including the locations that are the subject of this suit.

30.     To effectuate this management, Defendant ESA Management is party to a management agreement with Defendant ESA P Portfolio Operating Lessee, LLC.

31.     Defendant ESA Management has managed Extended Stay America hotels, including the locations that are the subject of this suit, since November 11, 2013, when it assumed the management company role.

32.    Since that time, any action taken by ESA Management is ultimately taken by and on behalf of ESA, Inc.

33.    Prior to November 2013, HVM, LLC, was the entity that managed the Extended Stay America hotels, including the locations that are the subject of this suit.  ESA, Inc., was also the parent of HVM, LLC.  When it managed Extended Stay America hotels, any action taken by HVM was ultimately taken by and on behalf of ESA, Inc.

34.    In November 2013, ESA Management assumed the assets and liabilities of HVM, LLC, and thereafter, ESA Management took responsibility for managing the Extended Stay America locations that are the subject of this suit, as well as other Extended Stay America locations.

35.    From at least 2009 through at least 2017, during which time Plaintiffs were trafficked at Extended Stay America hotels, ESA, Inc., had no employees of its own.  Instead, the management company for the relevant time—HVM, until November 11, 2013, and then ESA Management thereafter—employed both those employees who worked at local hotel locations ("hotel employees") and those who held regional or national roles in which they were responsible for more than one location ("corporate employees").

## FACTUAL ALLEGATIONS

## I.   NUMEROUS SIGNS OF PLAINTIFFS' TRAFFICKING SHOULD HAVE BEEN OBVIOUS TO DEFENDANTS.

36.   Over the course of approximately eight years, these four Plaintiffs were held at multiple ESA locations by multiple traffickers.  Their victimization followed a pattern that was readily observable and should have been obvious to ESA hotel employees based on information available to the public at large and to the hotel industry in particular.

37.   For example, as early as 2001, City of Atlanta officials publicly warned of sex trafficking at area hotels and of the relationship between prostitution and sex trafficking.

38.   That same year, the Atlanta Journal-Constitution published a series called *Selling Atlanta's Children*, describing the problem of sex trafficking in the city.  In that series, an Atlanta City Council official was quoted identifying hotels in particular as a venue for sex trafficking.[4]

---

[4] Jane O. Hansen, *Selling Atlanta's Children: Runaway Girls Lured Into the Sex Trade Are Being Jailed for Crimes While Their Adult Pimps Go Free*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *The Pimps: Prostitution's Middle Man Slides by in Court*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *Feds, Police Elsewhere Finding Solutions*, Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. 'We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl,' Boazman said."); Jane O. Hansen, *When Danger is as Close as a Phone*,

39.    In 2010, the Department of Homeland Security ("DHS") issued guidance to hotel companies identifying warning signs of sex trafficking at hotels.

40.    According to DHS, hotel staff should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, and the presence of multiple computers or cell phones.[5]

41.    There was also a specific focus on this activity in Georgia by other institutions.

42.    In 2011, then-Georgia Attorney General Sam Olens initiated a well-publicized, multiyear campaign to combat sex trafficking in Georgia. Attorney General Olens worked with the Georgia General Assembly to strengthen Georgia's human trafficking laws by enhancing the penalties

---

The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, *Police Plan Child Prostitution Unit*, The Atlanta Journal- Constitution, April 28, 2001. *See also*, Jane O. Hansen, *Selling Atlanta's Children: What Has and Hasn't Changed*, Special to CNN, July 18, 2015, https://www.cnn.com/2015/07/17/us/child-sex-trafficking-update-hansen/index.html (last visited Mar. 5, 2021).
[5] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry  (last visited Mar. 5, 2021).

under the state's criminal statute.

43.    In 2013, Attorney General Olens announced a statewide campaign called "Georgia's Not Buying It" to combat child sex trafficking.  As part of the campaign, Attorney General Olens' office "collaborated with partners to conduct trainings and increase awareness," which included "multiple trainings for the … hotel industry."[6]

44.    On September 15, 2013, the Georgia legislature passed O.C.G.A. § 16-5-47 requiring hotels to post sex trafficking notices "in each public restroom for the business or establishment and either in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees where similar notices are customarily posted."  The statute requires that the notice "provide information giving individuals a method to contact the National Human Trafficking Hotline and the Statewide Georgia Hotline for Domestic Minor Trafficking."  Failure to comply with O.C.G.A. § 16-5-47 is a misdemeanor.

45.    Upon information and belief, Defendants did not comply with O.C.G.A. § 16-5-47.

46.    In 2016, Attorney General Olens announced a statewide campaign to combat child sex trafficking entitled, "Unmasked."  The campaign featured a

---

[6] https://law.georgia.gov/press-releases/2013-03-18/attorney-general-olens-law-enforcement-announce-campaign-fight-sex (last visited Mar. 5, 2021).

public-service announcement, which played on various TV and radio stations in the Atlanta area and elsewhere.[7]

47.    In 2015, then-Acting Deputy Attorney General Sally Yates—who previously served as the United States Attorney for the Northern District of Georgia—identified Atlanta as an "epicenter" of sex trafficking.

48.    Defendants knew or should have known of this guidance and these statements by federal, state, and local officials and of the requirements of Georgia law.

49.    Defendants also knew or should have known of ECPAT-USA, the leading anti-child trafficking organization in the United States seeking to end the commercial sexual exploitation of children, and the Code, a joint venture between ECPAT-USA and the tourism industry setting out the world's first and only voluntary set of business principles that travel and hospitality companies can implement to prevent sexual exploitation and trafficking of children.

50.    The Code was first written in 1998, and it was signed by Carlson Companies in 2004, by Wyndham, Hilton, and Delta in 2011, and by Sabre Holdings in 2012.

---

[7] https://law.georgia.gov/press-releases/2016-04-26/attorney-general-sam-olens-announces-statewide-campaign-combat-child-sex (last visited Mar. 5, 2021).

#3161866v12

51.     As early as 2011, ECPAT-USA partnered with hospitality brands to co-develop training for hotel employees to help them recognize indicators of human trafficking, including the commercial sexual exploitation of children.

52.     ECPAT-USA has also published a number of indicators of trafficking to help hospitality and tourism businesses identify and combat trafficking. Those indicators include paying for rooms using cash or gift cards, paying for multi-day stays one day at a time, requesting isolated rooms or rooms close to an exit, repeatedly wearing the same attire or attire that is revealing or inappropriate for the weather, and possessing few personal belongings.

## II.     PLAINTIFFS WERE EACH SOLD FOR SEX AT THE ESA ATLANTA LOCATIONS AND ESA BATON ROUGE.

53.     From 2009 through 2017, Plaintiffs C.A., K.P., R.K., and T.H. were trafficked at multiple ESA Atlanta locations and at the ESA-Baton Rouge.

54.     As further alleged below, Plaintiffs were sometimes trafficked with other victims, including minor victims, by the same trafficker or associates of that trafficker.

55.     Plaintiffs C.A., K.P., R.K., and T.H. are not the first sex trafficking victims to allege they were held at an ESA hotel.  Another trafficking victim, Jane Doe 3, has filed suit against ESA related to her trafficking at certain of the ESA Atlanta locations and at ESA-Baton Rouge from 2009–2012.

56.     Jane Doe 3 was trafficked by a trafficker who also trafficked Plaintiffs

C.A., R.K., and T.H.  The mere fact of that trafficker frequently appearing at different ESA locations across Atlanta with a rotating cast of young women was, itself, suggestive of trafficking to any ESA employee who witnessed him.

57.   During their trafficking at the ESA Atlanta locations and ESA-Baton Rouge, each Plaintiff exhibited signs of trafficking identified in the DHS guidance and by ECPAT-USA, as described above.

58.   The volume of foot traffic of men—carrying no luggage or belongings— going to and from the hotel rooms in which Plaintiffs and other victims were held at the ESA Atlanta locations and ESA-Baton Rouge—with those men generally staying for less than a half hour at a time—evidenced trafficking.

59.   Plaintiffs observed this open and obvious trafficking activity while they were at ESA hotels.  In the ESA hotel hallways, Plaintiffs often encountered other girls whom they did not personally know but whom they recognized to be trafficking victims.

60.   The same foot traffic was visible to ESA hotel employees and on ESA's security cameras, which captured footage all over the property, which, on information and belief, was visible via live monitors in each ESA hotel's front office.

61.   The Plaintiffs' trafficking followed a similar pattern at each ESA hotel. Plaintiffs C.A., R.K., and T.H. had a common trafficker, though they were not always trafficked together, and were required to see around 10 buyers each

day or at least enough to meet the $1,000/day quota set by their trafficker. Plaintiff K.P., though under the control of a different trafficker, was held to the same standard. Plaintiffs had no say in who they saw, and they could not refuse to have sex with a buyer. Plaintiffs' traffickers kept all the money paid by the buyers, allowing Plaintiffs just enough cash for necessities such as food or to pay the daily rate for the hotel room.

62.     Even when Plaintiffs stayed at a hotel for multiple days, Plaintiffs usually paid for rooms daily in cash or gift cards at the front desk, even when the rooms were not in their names, at the direction of their traffickers.

63.     Plaintiffs' deteriorating physical condition was visible to hotel staff at the ESA Atlanta locations and ESA-Baton Rouge and anyone else who interacted with them. Plaintiffs' outward physical appearance often reflected bruises or other evidence of physical beatings by their respective traffickers.

64.     Plaintiffs' appearance was indicative of sex trafficking. Plaintiffs were required to dress provocatively—usually wearing high heeled shoes and short-hemmed skirts—regardless of the time of day or season. They were required to always be selling sex.

65.     Hotel employees observed Plaintiffs in and around the hotel, on trips to the hotel vending machine and to breakfast, if the hotel provided it.

66.     And because Plaintiffs were required to submit to commercial sex buyers at all times, day or night, they were often not allowed to sleep at

night.  Sometimes they were beaten for sleeping at all. Each Plaintiffs'
appearance often reflected fatigue, sleep deprivation, poor hygiene, and the
fact that Plaintiffs' often subsisted on bags of chips and vending machine food
for long periods of time.

67.     Almost daily, Plaintiffs requested multiple sets of towels and bed
linens—an excessive amount for any ordinary guest—to clean up buyers and
themselves from the frequent commercial sex acts in which they were
required to engage.  They sometimes requested linens directly from
housekeeping employees and sometimes requested them directly from the
front desk.  While they were still minors, R.K. and T.H. would make these
kinds of requests daily to the front desk and cleaning staff.

68.     Housekeeping employees who entered Plaintiffs' hotel rooms observed
signs of sex trafficking, including trashcans overflowing with used condoms,
cash, cell phones that outnumber hotel room occupants, and other electronic
devices used to post internet advertisements for commercial sex.

69.     And although they often stayed for multiple days at a time, Plaintiffs
had few, if any, personal belongings.

70.     Additionally, Plaintiffs each engaged in other behavior while being
trafficked at the ESA Atlanta locations and ESA-Baton Rouge that should
have put hotel employees on notice that they were being trafficked.  Plaintiffs
each failed to make eye contact with others, lacked control over money and

other personal belongings, and were closely monitored by the men who trafficked them.

71.    Plaintiffs' traffickers did not allow them to keep any money while they were held at the ESA Atlanta locations and ESA Baton Rouge; they collected the money Plaintiffs received from buyers daily.

### A.    The Trafficking of C.A. at ESA hotels

72.    From approximately 2009 through 2015, Plaintiff C.A. was trafficked for sex at multiple ESA hotels including:

- ESA-Clairmont
- ESA-Crestline
- ESA-Cumberland
- ESA-Hammond
- ESA-Jimmy Carter
- ESA-Peachtree Road
- ESA-Peachtree Dunwoody
- ESA-2010 Powers Ferry
- ESA-2239 Powers Ferry
- ESA-Old Milton
- ESA-Baton Rouge

73.    C.A. was sold for sex numerous times from ESA hotel rooms.

74.    C.A.'s traffickers controlled her through threats and violence.

75.    C.A.'s trafficker imposed a $1,000/day quota.  With a minimum "price" of $100 per buyer, this meant C.A. was regularly sold ten or more times each day.

76.    During 2009–2010, C.A. was sold for sex frequently at the ESA-Hammond.

#3161866v12

77.    While at the ESA-Hammond, C.A. was sold to 20–30 buyers per day.

78.    During this time period, the trafficking at the ESA-Hammond was open and obvious with numerous traffickers and victims engaging in an open, obvious, and bustling commercial sex trade.  C.A. describes buyers pulling up to the hotel without having made a reservation or earlier plans and being able to buy sex on demand.

79.    Because the doors to rooms at the ESA-Hammond opened to exterior breezeways facing the parking lot, the foot traffic was particularly conspicuous.  C.A. recalls seeing between 80–100 buyers coming and going daily at the ESA-Hammond while she was trafficked there.

80.    During 2011–2013, C.A. was sold for sex frequently at the ESA-Peachtree Road.  In fact, for several months during 2011, C.A. lived at the ESA-Peachtree Road during which she was sold for sex.

81.    At the ESA-Peachtree Road, C.A. was frequently trafficked with other victims, including K.P.

82.    When staying at the ESA-Peachtree Road for multiple consecutive days, C.A. or her trafficker would pay for the room daily in cash or using gift cards.

83.    Frequently, when C.A. was trafficked here, other traffickers with multiple victims each were present.

84.    In addition to the manager who would alert C.A.'s trafficker of good

(and bad) times to traffic victims like C.A. out of this location, C.A. recalls other staff who would direct her and other trafficking victims regarding which exterior doors would be open at night for buyers to access the building or which exterior doors the victims and their traffickers should prop open.

85.   C.A. was trafficked from ESA-2010 Powers Ferry and ESA-2239 Powers Ferry, frequently with R.K. and another minor victim.

86.   When being trafficked at these locations, C.A. was typically held at the location for multiple days at a time.

87.   At the ESA-2010 Powers Ferry, C.A. typically used her ID to check in. Her trafficker frequently fraternized with the employees at the front desk.

88.   When held at the ESA-2010 Powers Ferry, C.A. was subject to her $1,000/day quota, but her trafficker's "goal" for the location was $2,000.

89.   At the ESA-2010 Powers Ferry, there was a stairwell that remained open and unlocked for buyers.

90.   As with other locations, C.A.'s trafficker beat her at the ESA-2010 Powers Ferry location and did so in common areas of the hotel.  For example, her trafficker punched her in the parking lot and knocked her down the stairwell buyers used to access the hotel.

91.   When trafficked at the ESA-2239 Powers Ferry, C.A. and R.K. were nearly always held together.

92.   At the ESA-2239 Powers Ferry, C.A. typically saw 10–15 buyers per

day.

93.    C.A. was also trafficked from the ESA-Baton Rouge multiple times.

During one stay, the ESA-Baton Rouge was raided by police and another

trafficking victim was arrested.

94.    Additionally, one of C.A.'s traffickers was frequently loud and

aggressive when at the ESA-Peachtree Road with her.  Verbal and physical

altercations between C.A. and her trafficker would have been loud enough for

hotel employees to hear.

### B.    The Trafficking of K.P. at ESA hotels

95.    From approximately 2010 through 2017, Plaintiff K.P. was trafficked

for sex at multiple ESA locations including:

- ESA-Clairmont
- ESA-Hammond
- ESA-Peachtree Road
- ESA-2239 Powers Ferry
- ESA-2010 Powers Ferry

96.    K.P.'s trafficker controlled her with threats and violence.

97.    K.P.'s trafficker also imposed a $1,000/day quota.  With a minimum

"price" of $100 per buyer, K.P. was regularly sold ten or more times each day.

98.    From 2011–2014, K.P. was frequently trafficked from the ESA-

Peachtree Road.  During her stays at the ESA-Peachtree Road, K.P. stayed

from a few days to multiple weeks and saw from 2–8 buyers each day she was

at this hotel.

99.    When she was trafficked from hotel rooms at the ESA-Peachtree Road, K.P. was often trafficked from the same room as C.A. or from a room nearby. If they were in the same room, one girl would hide in the bathroom while the other was with a buyer.

100.   Once, while at being trafficked from the ESA-Peachtree Road, K.P. experienced a traumatic breakdown as a result of being trafficked.  She was taken screaming, crying, and throwing things from the lobby of the ESA-Peachtree Road.  The hotel employees said and did nothing to help K.P.

101.   During her stays at the ESA-Peachtree Road, K.P. observed open and obvious sex trafficking activity, including cars that came, stayed for short periods of time, and then left.  She also observed these same buyers coming to buy sex from other trafficking victims who were also being held at the ESA-Peachtree Road.  This sex trafficking activity was easily observable from the window of K.P.'s ESA hotel room and was readily visible and observable by ESA hotel employees.

102.   K.P. was also trafficked at the ESA-2239 Powers Ferry, ESA-2010 Powers Ferry, and the ESA-Clairmont.  At these ESA hotels, K.P. experienced similar conditions and made similar observations about the open and obvious sex trafficking.  K.P. stayed at these ESA hotels on several occasions for one to two nights at a time.

103.   During her stays at ESA hotels, K.P. often appeared in the lobby after the regular breakfast hours, because she was required to "work"—servicing buyers for commercial sex—during the night.  During these times, the ESA hotel employees observed her physical appearance, which suggested malnourishment, poor hygiene, fatigue, and sleep deprivation.  Hotel employees even permitted her to access the non-public area where the breakfast food was stored.

### C.    The Trafficking of R.K. at ESA hotels

104.   From approximately 2009 through 2013, Plaintiff R.K. was trafficked for sex at multiple ESA locations including:

- ESA-Leland
- ESA-Peachtree Road
- ESA-2010 Powers Ferry
- ESA-2239 Powers Ferry
- ESA-W. Interstate
- ESA-Baton Rouge

105.   In 2009, R.K. and T.H. were lured to Atlanta by their shared first trafficker under false pretenses—including promises that when they arrived, they would be "taken care of."  Instead, they were told to go to the ESA-Leland, where, within only a few hours, they found themselves being sold for sex.  R.K. learned that she had to "earn" $1,000/day for her trafficker, who prohibited her from eating until she earned that money.

106.   During the time she was trafficked, instead of being "taken care of,"

R.K. was required to turn over all money to her trafficker.

107.   For the following week, R.K. and T.H. were trafficked from the ESA-Leland.  At this time, both R.K. and T.H. were minors, under the age of 18.

108.   As a minor and during the first week she was trafficked, R.K. was required to perform as a dominatrix for a buyer at ESA-Leland.

109.   In the following weeks, R.K. was sold from ESA-Leland, and ESA-W. Interstate—both hotels are located near the intersection of Interstate 75 and Windy Hill Road.  Her stays at those hotels last from a few days up to a week at time.  R.K. was trafficked from these two ESAs over 20 times between late 2009 and 2013, typically staying 3–5 days at each location.

110.   R.K. was also trafficked from the ESA-Peachtree Road, often with C.A. with whom she stayed.  R.K. stayed at this hotel a minimum of five times, for around three days at a time.

111.   R.K. was also frequently sold from ESA-2010 Powers Ferry and ESA-2239 Powers Ferry from 2009–2013, when she was trafficked.  During the period R.K. was trafficked, these two ESAs were among the places where she was most frequently trafficked.  R.K.'s stays at the two ESA hotels on Powers Ferry Road often lasted for five days to a week.

112.   R.K.'s trafficker controlled R.K. through threats and violence.  Her trafficker made his willingness to use violence clear by beating another victim in front of R.K.  Later, R.K.'s trafficker beat R.K. if she refused to

comply and threatened to shoot her if she tried to leave.  R.K. also knew he carried a gun and therefore could deliver on that threat.

113.   Initially, R.K. was trafficked with T.H.  Later, she was trafficked with numerous other trafficking victims controlled by her trafficker, including C.A. and others.  When she was trafficked at ESA hotels, R.K. also observed other traffickers and other trafficking victims at the hotels.

114.   When R.K. was trafficked from ESA hotels, including when she was only 17 years old, hotel employees had numerous opportunities to observe her.  And even though she was under 18 years old, ESA hotels rented hotel rooms to R.K.'s trafficker and at times to R.K., though she did not have identification.

115.   R.K. was also trafficked from the ESA-Baton Rouge, including when she was a minor.  Her experience of being trafficked at the ESA-Baton Rouge was similar to her experience of being trafficked at other ESA hotels.

**D.     The Trafficking of T.H. at ESA hotels.**

116.   From approximately 2009 through 2011, Plaintiff T.H. was trafficked for sex as a minor at multiple ESA locations including:

- ESA-Leland Drive
- ESA-W. Interstate
- ESA-Baton Rouge

117.   As described above, T.H. was lured to Atlanta with R.K. under false pretenses.  T.H. learned that she had to "earn" $1,000/day for her trafficker

and was trafficked for the following week at the ESA-Leland.  T.H. was 16 years old at the time.

118.   Like R.K., during the time T.H. was trafficked, she was required to turn over all money to her trafficker, retaining only enough to pay a daily room rate when the room was not otherwise covered.

119.   In the following weeks, T.H. was sold from ESA-Leland, and ESA W. Interstate—often with R.K.  She stayed for a few days up to a week at time.

120.   During her stays at these ESA hotels, T.H. observed open and obvious sex trafficking activity, including other traffickers and other trafficking victims at the hotels, cars that came, stayed for short periods of time, and then left. She also observed numerous buyers coming to the hotel, staying for short periods of time, and then leaving.

121.   At times, T.H. was trafficked with several other trafficking victims, including Jane Doe 4, C.A., and others, who were also controlled by her trafficker.

122.   T.H.'s trafficker controlled T.H. through threats and violence.  Her trafficker made his willingness to use violence clear by beating another victim in front of T.H.  Later, T.H.'s trafficker used physical violence on T.H., including choking her for falling asleep instead of selling herself 24 hours a day.

123.   When T.H. was trafficked from ESA hotels, including when she was

under 18 years old, hotel employees had numerous opportunities to observe her.  And even though she was under 18 years old, ESA hotels rented hotel rooms to T.H.'s trafficker and at times to T.H., though she did not have identification.

124.   T.H. was also trafficked from the ESA-Baton Rouge, including when she was a minor.  Her experience of being trafficked at the ESA-Baton Rouge was similar to her experience of being trafficked at other ESA hotels.

## III.   DEFENDANTS KNEW OR SHOULD HAVE KNOWN SEX TRAFFICKING AND PROSTITUTION WERE OCCURRING.

125.   Defendants had direct knowledge of sex trafficking and prostitution at ESA locations through their employees.  These included local hotel employees who worked at the hotel itself and corporate employees who visited the hotels involved for the purpose of monitoring the revenue, occupancy, online reviews, and physical premises of the hotel.

126.   Until November 2013, HVM was the manager of all the ESA Atlanta locations and the ESA-Baton Rouge and employed all the hotel employees at each hotel location.  As a result, notice  any employee constituted notice to HVM and, in turn, to its parent, ESA, Inc.

127.   Beginning on or around November 11, 2013, ESA Management became the manager of all the ESA Atlanta locations and the ESA-Baton Rouge and employed all the hotel employees at each hotel location.  As a result, notice to

any employee constituted notice to ESA Management and, in turn, to its parent, ESA, Inc.

128.   ESA hotel employees continued to act as lookouts for traffickers, alerting them to the presence of law enforcement, through at least 2017. These hotel employees' knowledge, support, assistance, and facilitation of trafficking and prostitution constitutes knowledge, support, assistance, and facilitation by their employers.

129.   In addition to knowledge of the hotel employees, ESA corporate employees also had every reason to know of trafficking and prostitution at the ESA Atlanta locations and the ESA-Baton Rouge.

130.   ESA corporate employees inspect and review every location at least annually.  Additionally, thanks to ESA's use of platforms like Medallia, corporate employees can and do receive real time data on customer experiences at ESA locations, including the ESA Atlanta locations and the ESA Baton Rouge.

131.   On information and belief, ESA received information, complaints, and notices of trafficking and prostitution from others who were concerned about sex trafficking and prostitution at ESA hotels.

### A.   The trafficking and prostitution activity at ESA hotels was open and obvious.

132.   When Plaintiffs were trafficked at ESA hotels, it was clear that hotel

employees knew that they were forced to engage in commercial sex. The signs of trafficking and commercial sex were too obvious and too numerous to permit any other conclusion.

133.   When these Plaintiffs were being trafficked at ESA locations, ESA hotel employees saw signs of sex trafficking and commercial sex including the following.

134.   A girl or young woman, sometimes more than one, checks in to the hotel with an older, well-dressed man. The girl or girls wear high heels and dress provocatively and often inappropriately for the weather. The men, meanwhile, wear designer-branded clothes and conspicuous diamond jewelry. The room is paid for daily, generally in cash. Often, the man rents the room in his name the first night, and on subsequent days, the young women— sometimes minors—renew the room rental daily, often in cash.

135.   All day and all night, hotel employees observe men with no luggage or belongings arrive at the room or rooms rented by the group, enter and stay for a short period of time, and then leave—one after the other.

136.   And because there are often multiple girls in the same room—and there are often trafficking victims in numerous rooms at the hotel at a given time— the traffic of buyers is constant and not isolated to one room.

137.   Hotel employees at the ESA-Peachtree Road did more than observe sex trafficking: they actively participated in it. At the ESA-Peachtree Road, a

manager was in regular communication with C.A.'s trafficker.  The ESA-Peachtree Road manager would alert C.A.'s trafficker when he should reserve rooms in advance for lucrative events likely to attract commercial sex buyers. Alternatively, the manager would tell C.A.'s trafficker if he should stay away to avoid being caught because of a different event—for example, when a youth sports team would be visiting the hotel.

138.   When staying at the ESA-Peachtree Road, hotel employees acting as lookouts routinely called the rooms where C.A. and K.P. were trafficked to warn when police were on the premises.  Hotel employees would also call with warnings to slow the number of buyers to the room to avoid detection or drawing unwanted attention.

139.   And hotel employees at the ESA-Peachtree Road routinely propped open doors or notified C.A. and K.P. which back or side door would be open throughout the night for buyers to enter the hotel and to assist and facilitate their trafficking.

140.   At the ESA-Hammond, a trafficking victim disclosed her trafficking to a hotel employee at the front desk. His only response was to pull out a box from under the desk filled with lingerie—and offer to sell her some.

141.   ESA hotel employees at the locations where Plaintiffs were trafficked also observed the signs of physical violence Plaintiffs suffered at the hands of their traffickers including bruises, marks and other evidence of the force,

fraud and coercion that is a well-known sign of sex trafficking.

**B.    Publicly available reviews confirmed the prevalence of commercial sex and other criminal activity at the ESA hotels.**

142.   For years, the publicly available reviews of ESA Atlanta locations and the ESA-Baton Rouge where Plaintiffs were trafficked confirmed the open and obvious criminal activity—including prostitution and sex trafficking—taking place at these locations.  The fact that these conditions were open and obvious to occasional visitors and guests further confirms that these conditions were easily observable by and were known to hotel employees and consequently, Defendants.

143.   Furthermore, Defendants actually read and responded to the reviews. These were not generic form responses.  Instead, after hotel employees read the reviews, persons involved in the management of these ESA hotels responded and specifically acknowledged the details of these reviews.

144.   Moreover, since at least 2013, Defendants used a company called Medallia to review and analyze customer feedback like online reviews. Defendants praised Medallia for helping hotel managers stay "more on top of responding to any kind of comments, positive or negative," and managers reported looking at Medallia data on customer reviews daily.

145.   Reviews going as far back as 2009 specifically noted obvious instances of commercial sex, often alongside other crime, occurring throughout the

hotels.  A sampling of these reviews includes the following:[8]

a.  A reviewer reported on March 23, 2009 that there were "**hookers**" at the ESA-Peachtree Road.

b.  A reviewer in 2012 reported that **"[t]here were hookers walking in and out**" of the ESA-Clairmont and observed the smell of "pot" in the hallways.

c.  A reviewer on August 18, 2012 said the ESA-Old Milton "looked like a **pay by th[e] hour** sleeze hotel!"

d.  A November 9, 2012 review of the ESA-2010 Powers Ferry reported that, when the customer arrived at the hotel, he saw "a bunch of Sherriff's in their vests coming out of the hotel," and reported that one of the officers "said they were there '**looking for hookers**.'"

e.  In a review of the ESA-2010 Powers Ferry from February 21, 2015, a reviewer reported that both this hotel and another ESA hotel on Powers Ferry Road (presumably the ESA-2239 Powers Ferry) were "**frequented by hookers**."

f.  A March 2015 review of the ESA-2010 Powers Ferry said that it

---

[8] The bold text in the subparagraphs of ¶¶ 145–148, 186 is supplied, and alteration, where added, is indicated by punctuation within the text. Otherwise, reviews are quoted as written, preserving the reviewers' spelling and grammar.  A composite of these reviews is attached as Exhibit A.

fell "**somewhere between a brothel and a battered women's shelter**."

g.   A January 2016 review commented on obvious signs of ongoing commercial sex operations taking place in full view of anyone at the ESA-Hammond.  The reviewer complained that the ESA-Hammond served customers who were "very shady," "drinking and smoking all night" and observing the "[v]ehicles driving through all night" and "**many of the visitors**" coming into the hotel and staying just "**5 minutes in the room**."

h.   In about April 2016, one reviewer reported a "sign" at the ESA-2239 Powers Ferry "suggesting this is a prostitution spot."

i.   A July 25, 2016 reviewer could tell immediately that the ESA-Hammond was "a **drug and prostitute hotel**" and was "[s]o terrified" that the reviewer left immediately.

j.   In July 2017, a reviewer of the ESA-2239 Powers Ferry reported observing a "**[p]rostitute going in and out**" of the hotel and noted that the "area of the building [was] very dark and shady" with "people hanging out in parking lot at night."

146.  Reviews like these did not end after Plaintiffs escaped their traffickers. Instead, publicly available reports of prostitution, often accompanied by other criminal activity, continued to appear.  That this conduct was evident to

ordinary hotel guests confirms that any reasonable hotel worker would also understand that commercial sex and other crime was prevalent at the locations.   Examples of such reviews include[9]:

a.    On January 10, 2018, a reviewer reported "[p]lenty of crackwhores walking around" the ESA-Peachtree Road.

b.    In a February 9, 2018 post, a reviewer of the ESA-2239 Powers Ferry said that the "**front desk told** me the[y] gave my room away and the hotel was booked because **ladies of the night took all the rooms**."

c.    On February 28, 2018, a reviewer described the ESA-2239 Powers Ferry as "swarming with small groups of men." According to the reviewer, the men were "[s]huffling, smoking, drinking, in and out of the parking lot, lobby, elevators, rooms" and there "were several small parties happening in various rooms."  The reviewer also "saw one woman who I am fairly sure was an escort."  It was clear to the reviewer, and anyone else paying attention, that the hotel was "**being used as something beyond a hotel**," and it felt "dangerous."

d.    A March 18, 2018 review of the ESA-2293 Powers Ferry reported

---

[9] A composite of these reviews is attached as Exhibit B.

seeing "**drug addicts and women selling themselves**."

e.  In about April of 2018, several reviewers reported seeing prostitutes at the ESA-Leland, including one who commented that the hotel was "[n]ot safe" and that there were "**questionable characters, smell of drugs, [and] hookers**." Another review saw "**a lot of people on drugs and prostitutes**" at the hotel.  And a third review observed that the "**place was loaded with prostitutes**."

f.  One reviewer said on August 29, 2018 that there were "[p]eople smoking pot outside the pool area" of the ESA-Peachtree Road and that the reviewer later learned this hotel "**was also a place for prostitution**."

g.  A September 2018 review of the ESA-2239 Powers Ferry described a dark, hidden hotel with poor signage where "numerous people" were "hanging out in dark corners/areas of the parking lot" or "partying in the parking lot."  The reviewer saw "questionable activity going on in the parking, as one vehicle repeatedly drove slowly through the parking lot."  The reviewer and his wife were assigned a room, but when they arrived, there was someone "already occupying that room," with "dirty linens" in the "bathroom area" and "money laying on the counter."

h.     In a review dated January 14, 2019, a person reported "**crime and trafiking … plus prostitution**" in connection with the ESA-Peachtree Road.

i.     One reviewer reported in about March 2019 that the ESA-Clairmont had "**women walking around shirtless, front desk attendant parking lot pimping**, guests smoking weed all day and night—hallways full of the scent and smoke, yet front desk seem to careless."  Another review around the same time reported "[d]rug addicts out front" of the hotel.

j.     A review from about April 2019 of the ESA-Peachtree Dunwoody warned not to be "shocked to here **a pimp and a h*e arguing in the next room over**."  Another review around the same time reported that a whole floor of this hotel "smells like weed."

k.     A May 2, 2019 review of the ESA-Peachtree Dunwoody commented that there were "**hookers right out side the lobby**" and that the "lobby smelled of a bar/strip club."  Employees staffing the lobby must have also seen and smelled the same things.

l.     A reviewer posted on September 16, 2019 about suspicious activity in the room next to her at the ESA-Peachtree Road. According to the reviewer, "**there were men going in and out**

**of the room**" all night, knocking each time and waking her up "**every hour**."  One man arrived at 3am and said he was "not into drugs."  The reviewer said she **complained to the front desk about this activity**.

m.   In a July 12, 2020 review of the ESA-Leland, a person reported that there was "**a lot of prostitution … going on which also make[s] me feel uncomfortable**."

n.   In August 2020, one reviewer of the ESA-2010 Powers Ferry reported "regularly" observing "**women who take part in the 'world's oldest profession'**" loitering in the hallways.

147.   Along with its knowledge of these reviews—expressly indicating prostitution or sex trafficking was open and obvious to guests—Defendants' employees and therefore Defendants, were also aware of reviews of reporting other obvious criminal activity at the ESA hotels, including drugs and violence.  Despite public complaints and reviews that date back over a decade, the conduct appears to have continued.  Such reviews include:[10]

a.   For over 15 years, from 2005 to 2020, visitors to the ESA-Leland repeatedly and consistently reported signs of obvious criminal activity, including the smell of marijuana throughout the hotel.

---

[10] Certain of these reviews is attaches as composite, Exhibit C.

Despite repeated public comments and responses by ESA

employees and management, the open criminal activity has

continued unabated.

b.    Reviewers made similar comments about obvious criminal

activity and smelling marijuana throughout the property at the

ESA-Jimmy Carter starting at least as far back as March 2011.

One such review reported in March of 2018 that the lobby itself

"reeked of Marijuana" and another reviewer observed "strangers

having coitus at the front desk!"

c.    Reviews of the ESA-2010 Powers Ferry suggest that this property

has been a known illicit drug hot spot for years.  One June 2017

review of this hotel reported obvious criminal activity and the

presence of people who did not appear to be hotel guests noting

that there "was weed smoke everywhere and crazy squatters out

at the pool."  And another in March 2018 post showed that this

drug activity persists, calling the hotel a "Drug dealers heaven"

and reporting that the entire "place smelled like weed all the

time, both smoked and unsmoked."

d.    A review of the ESA-Peachtree Dunwoody on June 26, 2017

reported that, while staying at the hotel, someone came to the

room and asked if the reviewer wanted to buy drugs, indicating

that this was the type of hotel where illicit sales occur with abandon. This review was consistent with later reviews, like one in March 2018, complaining that there was "[w]ay to much pot smoking going on" at the ESA-Peachtree Dunwoody, another from June 2019 observing that "[w]eed smoke … smelled up the second floor."

e.   Several reviews of the ESA-Cumberland from at least as far back as December 2017 also reported crime and the obvious smell of marijuana throughout the building.

f.   Likewise, a December 2017 review of the ESA-W. Interstate reported the obvious smell of marijuana in the hallways.

g.   On December 8, 2017, a reviewer complained about the room next door at the ESA-Hammond because the occupant had folks coming "in and out all night" and there was a "smell of weed coming from [their] room into ours."

h.   Reviewers commented similarly about the ESA-2239 Powers Ferry, observing in March 2018 that the "entire lobby smelled like Marijuana." This problem hasn't gone away. As recently as May 24, 2020, a person reported seeing people "smoking weed and crack on stair way and side doors" at the ESA-2239 Powers Ferry.

i.    An August 28, 2018 post reported that "nearly all floors" of the ESA-Crestline "reak[ed] of mar[i]juana smoke" and that there were "drug attics constantly walking and slamming doors all night long."

j.    A review dated April 9, 2019 reported that the reviewer "continued to smell marijuana throughout my entire stay" at the ESA-Clairmont.

k.    An October 12, 2020 review of the ESA-Crestline reported that the "[e]ntire building smells like weed!"

148.  Numerous reviews also noted that despite the ongoing and obvious criminal activity taking place at the hotel, hotel management continually failed to provide adequate security.  And worse, hotel employees or owners knew about crime and did nothing about it.  These are perfect conditions for sex trafficking to take place, and the defendants should have known that. Examples include the following[11]:

a.    In an April 22, 2013 post, a reviewer complained that there was "drug activity" at the ESA-Jimmy Carter Blvd and that "the staff is made aware but nothing is done ever."

b.    On August 14, 2013, a reviewer reported that he was "**robbed by**

_____

[11] A composite of these reviews is attached as Exhibit D.

**gunpoint**" at the ESA-Peachtree Road and that the "hotel did not provide any type of security in a very dangerous city." "[T]he hotel is **not taking responsibility for lack of security** and they will pay dearly for that," the reviewer warned.

c.   On July 24, 2014, a reviewer complained of that lack of security at the ESA-Leland.  According to the post, someone broke into the reviewer's car in the parking lot and the attitude of the staff was "**callous as if it happens so regularly**."

d.   One reviewer of the ESA-Jimmy Carter Blvd said on February 16, 2015, that the hotel was "the 'one stop shop hotel' to Get High" and that there were "live in drug sellers" at the hotel.  The reviewer also complained that the property had inadequate security inside and out.

e.   On March 3, 2017, a reviewer observed a "[w]eed smell in the hallway" and "strange looking 'women' and crazy looking young 'men'" in the parking lot of the ESA-Clairmont.  The reviewer said, "I honestly **believe the hotel staff is involved**." And the reviewer reported that someone "[k]icked in my room door," after which, he left the hotel.

f.   In an April 14, 2017 post, a man reported "the smell of Marijuana" at the ESA-2010 Powers Ferry.  When the reviewer

complained, the manager dismissed the complaint about criminal activity taking place at the hotel and responded that the hotel "had no control of what happens in the rooms."

g.      A reviewer in May 2017 said he or she "was **robbed by gunpoint** by 2 thugs **ON hotel property**" at the ESA-Peachtree Road and reported that the hotel had "**no cameras, unlocked front doors, [and] dark exterior (poor lighting)**."

h.      In about April of 2018, a reviewer of the ESA-2239 Powers Ferry complained that the property lacked sufficient security and the "public areas are too dark," which posed a major safety concern.

i.      A review from about April 2019 of the Leland-ESA reported that the property was unsafe and that there were "no security cameras" in the parking lot.

j.      A review of the ESA-Peachtree Dunwoody from about April 2019 noticed "people in the front of the building smoking weed" and wondered if they were employees of the hotel. At the very least, the reviewer said that the "front desk attendants [needed] to pay more attention to that's going on at their hotel."

k.      A reviewer in December of 2019 complained of feeling unsafe at the ESA-Leland because "the place is dark inside and outside" and had "[n]o security."

#3161866v12

43

l.     On February 20, 2020, a reviewer commented that the ESA-Peachtree Road "seemed like a drug dealers" and observed the "same Sketchy people on all floors and waiting at entrance" of the hotel.  The reviewer also said that there was "[l]ow lighting in the halls" and "absolutely NO cameras anywhere.  Not a safe feeling."

m.     In a November 2020 post, a reviewer said that "[m]arijuana use [was] **allowed by the Manager**" of the ESA-2239 Powers Ferry.

## C.     The Defendants knew or should have known about arrests and criminal activity at the ESA hotels.

149.   Numerous arrests and criminal investigations notified the Defendants of the foreseeable risk of sex trafficking occurring at ESA Atlanta locations and in the ESA-Baton Rouge, including locations where Plaintiffs were trafficked.  Similar criminal activities persist at least some of these properties to the present day.  Such incidents include those alleged below.

150.   On January 10, 2010, Sandy Springs police responded to a 911 call from a woman at the ESA-Peachtree Dunwoody who said she had been assaulted in one of the rooms.  When police arrived at the room, the occupants fled.  Police found evidence of marijuana and a laptop computer displaying evidence of online advertisements for prostitution.  The police apprehended a woman, who had tried to climb out of the window.  The woman confirmed that she had engaged in commercial sex and identified two

men who were the "pimps." She explained to the police that one of the pimps slapped her in the face when she refused to engage in commercial sex. She had obvious "marks on her face."

151. An employee at the ESA-Peachtree Dunwoody contacted Sandy Springs Police on March 10, 2010 about possible prostitution occurring in one of the rooms there.

152. On January 13, 2011, an undercover police officer responded to an online advertisement for commercial sex. The woman who answered his call directed him to the ESA-Peachtree Dunwoody, where she was arrested for prostitution.

153. On January 15, 2011, police arrested two men and two women on prostitution charges at the ESA-Peachtree Dunwoody.

154. On May 14, 2012, police responded to a call at the ESA-Peachtree Dunwoody reporting suspected prostitution activity. Police arrived to find a woman in the room and "several condoms and a bottle of lotion on the end table next to the bed." Police also found "five cell phones in the room."

155. A front desk clerk at the ESA-Peachtree Dunwoody called the Sandy Springs Police on June 1, 2011 to report possible prostitution at the hotel.

156. On November 6, 2012, the Marietta-Cobb-Smyrna (MCS) Organized Crime/Intelligence Unit conducted an operation at the ESA-2010 Powers Ferry in response to suspected prostitution and, in the process, arrested a 24-

year-old woman who had been engaged in prostitution for several weeks.

157.   On February 9, 2013, Cobb County Police responded to a hit-and-run call in the parking lot of the ESA-2010 Powers Ferry.  When police arrived, they encountered a male suspect who claimed to be "waiting for his girl." Police suspected the man was involved in a prostitution ring because they found women's shoes and clothes in his car and reviewed calls and text messages that indicating prostitution was occurring.  Police also confirmed with staff at the hotel that the man had a reservation at the hotel but was on the hotel's "no rent list" because of "prior incidents."

158.   On March 6, 2013, MCS Organized Crime/Intelligence Unit returned to the ESA-2010 Powers Ferry because nearby business owners, patrol officers in the area, and members of the general public had all complained of suspected prostitution.  Police arrested a 24-year-old woman for prostitution.

159.   Cobb County Police returned to the ESA-2010 Powers Ferry on April 24, 2013, responding to reports of prostitution at the hotel from nearby business owners and patrol officers in the area.  Police arrested a woman for prostitution.

160.   On May 29, 2013, the DeKalb County Police Vice Unit conducted a police operation targeting women engaged in prostitution at the ESA-Peachtree Road. An undercover police officer arrested two women engaged in prostitution and a man who had been paying for the room where the

prostitution took place.  Police charged the man with keeping a place of prostitution.

161.   On September 23, 2013, a hotel employee at the ESA-2010 Powers Ferry suspected prostitution in two rooms on the first floor of the hotel.  She contacted Cobb County police because a man had been staying for about a week in the room rented under a woman's name, and the employee had seen the man with several different women.

162.   On Feb. 1, 2014, police responded to a call at the ESA-Peachtree Dunwoody about possible prostitution occurring there.

163.   The Georgia Internet Crimes Against Children Task Force ("ICAC") investigated activities at the ESA-Peachtree Road in 2014.  On September 9, 2014, in cooperation with the United States Secret Service, the FBI's Metro Atlanta Child Trafficking Taskforce, known as "MATCH," and Brookhaven Police, the Dekalb County police found two girls at the ESA-Peachtree Road. One was 15 years old and the other 17 years old.  The investigation culminated in indictments of at least two individuals on charges of sex trafficking a minor in September of that year.  The two defendants pled guilty to lesser charges, including keeping a place of prostitution for a minor.

164.   On September 23, 2016, an employee at the ESA-Peachtree Dunwoody called the police to report possible prostitution occurring at the hotel.

165.   On October 11, 2016, Cobb County Police responded to a suspicious

person call and met a woman who claimed she was sexually assaulted by a

"Pimp" who beat and drugged her to force her into prostitution.  She showed

the police a video, which the police reported clearly showed she had been

drugged and beaten.  The woman reported that these crimes may have

occurred at the ESA-2010 Powers Ferry.

166.   On December 8, 2016, police responded to a call at the ESA-Peachtree

Dunwoody about suspected drug and prostitution activity occurring at the

hotel and discovered a prostitution ring run by male pimps.

167.   Sandy Springs police responded to a report about prostitution at the

ESA-Peachtree Dunwoody on June 28, 2017.

168.   The Cobb County District Attorney's office indicted two individuals on

charges of sex trafficking a minor at the ESA-W. Interstate in October 2017.

169.   On January 12, 2018, an undercover Sandy Springs police officer

responded to an online advertisement for commercial sex. The woman who

answered his call told him to meet her at the ESA-Peachtree Dunwoody.  The

police officer met her at a room at the hotel where she was arrested.

170.   On January 12, 2018, while investigating prostitution taking place at

the ESA-Peachtree Dunwoody, a Sandy Springs police officer spotted a man

and a woman smoking marijuana in a car in the parking lot.  When talking

with the two, police noticed a cell phone displaying "sexually explicit

language, indicating messages wanting to meet for sex."  The police

concluded that the man "was the pimp" and the woman was about to engage in commercial "sex at the hotel." The police officer arrested the two and charged them with disorderly conduct.

171.   Sandy Springs police responded to a report about prostitution at the ESA-Peachtree Dunwoody on Jan. 24, 2018.

172.   On February 28, 2018, police responded to a call from the ESA-Peachtree Road about a verbal dispute between and woman and a man in the parking lot at the hotel's entrance. The police found a "large amount of exotic underwear and makeup in the truck, consistent [with] the type of belongings that sex workers usually carry."

173.   On April 14, 2019, a person called the police to report suspected prostitution at the ESA-Leland.

174.   On July 5, 2019, the hotel manager at the ESA-Leland called police to report a high volume of "prostitution activity" at the hotel.

175.   By December 2019, the criminal activity was so bad at the ESA-Jimmy Carter that the Gwinnett County Solicitors General's Office told the hotel it needed to address it.

176.   On December 12, 2019, a person called the police to report prostitution activity at the ESA-Leland. The caller reported "seeing people coming in and out of the same room" all night.

177.   The Defendants' notice of the foreseeable risk of sex trafficking was not

confined to its Atlanta-area hotels.  The ESA-Baton Rouge, where C.A., R.K., and T.H. were trafficked, was also the location of several known crime reports that would have put Defendants on notice of the risk of sex trafficking at that location as well.  Such incidents include those described below.

178.   On December 8, 2010, two women from Texas were arrested for prostitution at the ESA-Baton Rouge as part of a sting operation conducted by Baton Rouge Police Department narcotics detectives.

179.   The Baton Rouge Police Department investigated suspected child sex trafficking at the ESA-Baton Rouge from January 30, 2011 through February 1, 2011.

180.   On April 13, 2011, Baton Rouge Police responded to an anonymous complaint about a woman engaged in prostitution at the hotel.

181.   On October 28, 2011, a 20-year-old called the police and admitted she was "running a prostitut[ion] business" at the ESA-Baton Rouge.  She called the police after her partner in the prostitution busines, along with several other men and women beat her at the ESA-Baton Rouge.  When the police arrived, they saw that she had "a swollen upper lip" and that "her finger nails were broken from fight[ing] back."

182.   On November 17, 2011, a woman was arrested for prostitution at the ESA-Baton Rouge as part of a sting operation conducted by the Baton Rouge Police Narcotics Detectives.

183.   On November 21, 2011, an anonymous caller reported suspected prostitution after witnessing numerous men going in and out of a room at the ESA-Baton Rouge.

184.   On January 19, 2015, a 26-year-old woman from Georgia was arrested for prostitution and the woman's fiancé—also from Atlanta, Georgia—got in a shootout in the hallways of the ESA-Baton Rouge ESA.  News reports showed the woman was later murdered in Atlanta and that her fiancé was arrested in Tennessee for promoting prostitution.

185.   On January 19, 2018, Baton Rouge Police confirmed that a 30-year-old woman was using the ESA-Baton Rouge as a place to engage in prostitution.

186.   Publicly available online reviews of the ESA-Baton Rouge confirm that the significant crime problem at this hotel has continued to the present day. Some of these reviews include the following[12]:

a.   A reviewer in July 2017 reported that the night clerk at the ESA-Baton Rouge was with friends one night who were "speaking vulgarly" about "**finding prostitutes** on Craig's list."

b.   In October of 2019, a reviewer said that the hotel "[f]elt like I was in a crack house."  Other reviews as far back as 2018 and through just late last year, reported smelling marijuana or other drugs at

---

[12] A composite of these reviews is attached as Exhibit E.

the ESA-Baton Rouge.  For example, one review in May 2018 that said the "entire third floor smelled like marijuana" and that the reviewer "felt very unsafe" at the hotel.

c.       A reviewer in February 2019 also felt "very unsafe" at the hotel. The reviewer reported hearing "[s]cary yelling and screaming noises" and "**beating noises and yelling and screaming from violent sounding men and women**."

d.       Another review in May 2019 said that the "property wreaked of marijuana" and noticed "bodily fluids in the elevators floor."

e.       A June 2019 review said that the hotel "reek[ed] of marijuana." This reviewer further reported while away from the room, it "was accessed 4 times with a hotel master key and my computer and iPad [were] stolen."  Based on the reviewer's experience, he concluded that the "**hotel ha[d] gangsters running it**."

f.       And a reviewer in August 2019 warned others to "[a]void this facility like the plague" unless "you like roaches and used drug injection needles in your room."

g.       In December 2019, a reviewer not only smelled marijuana in the hotel, but found some "On the floor" in the lobby.

h.       The next month, in January 2020, a reviewer witnessed three drug deals on the property.

i.    A June 2020 review reported that "employees working the front desk are giving out your information to the locals to come case the place!"

j.    A review in September 2020 noticed so much marijuana in the hotel that she could tell the hotel management was "allowing everyone to smoke weed," even though the "hotel is advertised as a non smoking hotel."

k.    Another review also in September 2020 reported that the "[w]hole [f]loor [r]eeked of [m]arijuana."

l.    And in December of 2020, a reviewer said that throughout the night, she could hear "people walking and arguing" and that "drug addicted" people were staying at the hotel.

## CLAIMS FOR RELIEF

## I. VIOLATIONS OF THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT[13]

### A. Defendants engaged in acts of racketeering activity.

#### 1. Keeping a Place of Prostitution.

187.   Keeping a place of prostitution in violation of Georgia law is racketeering activity.  O.C.G.A. §§ 16-6-10, 16-14-3(5)(A)(vii).

188.   While confined and detained against their will as alleged above, Plaintiffs and other victims were forced to perform sexual acts in exchange for money or other items of value.

189.   The ESA Atlanta locations and the ESA-Baton Rouge and the individual rooms they rented to sex traffickers offered seclusion or shelter for the practice of prostitution.  While having or exercising control over the use of the ESA Atlanta locations and the individual rooms located therein, ESA, Inc., ESA Management, and HVM knowingly granted and permitted the use of the ESA Atlanta locations and individual rooms therein for the purpose of prostitution.  ESA Management and HVM ratified and confirmed this grant and permission by allowing their employees to act as lookouts for traffickers while prostitution was taking place, affirmatively acting to prevent the detection and disruption of that activity by law enforcement.  In addition,

---

[13] The allegations in this section are common to Counts I and II.

after being alerted to prostitution at the ESA Atlanta locations, Defendants ESA, Inc., ESA Management, and HVM ratified and confirmed this grant and permission by failing and refusing to halt the activities of sex traffickers they knew were operating out of that hotel.

### 2.    Aiding and Abetting Prostitution.

190.   Prostitution in violation of Georgia law is racketeering activity. O.C.G.A §§ 16-6-9, 16-14-3(5)(A)(viii).

191.   Defendants ESA, Inc., ESA Management and HVM violated O.C.G.A § 16-6-9 at the ESA Atlanta locations when, acting through employees who served as lookouts for sex traffickers, they aided and abetted prostitution of Plaintiffs C.A., K.P., R.K. and T.H. and other victims who were forced into prostitution there.

### 3.    Aiding and Abetting Pimping.

192.   Pimping in violation of Georgia law is racketeering activity.  O.C.G.A §§ 16-6-11, 16-14-3(5)(A)(vii).

193.   Defendants ESA, Inc., ESA Management and HVM violated O.C.G.A § 16-6-11 at the ESA Atlanta locations when, acting through employees who served as lookouts for sex traffickers, they aided and abetted sex traffickers by warning them of police activity, guest complaints, and buyer activity so intensive that it was likely to attract the attention of law enforcement or cause guest complaints.  This aided and abetted the traffickers, who were

offering or agreeing to procure prostitutes for others, in violation of O.C.G.A

§ 16-6-11(1), and offering or agreeing to arrange meetings of persons for the

purpose of prostitution, in violation of O.C.G.A § 16-6-11(2).

194.   Defendants ESA, Inc., ESA Management and HVM violated O.C.G.A

§ 16-6-11(4) at the ESA Atlanta locations when they aided and abetted, as set

forth in the above paragraph and elsewhere, traffickers who received money

or other things of value from prostitution, without lawful consideration,

knowing it was earned in whole or in part from prostitution.

### 4.    Sexual Servitude in Violation of State Law.

195.   Trafficking a person for sexual servitude in violation of Georgia law is

racketeering activity.  O.C.G.A. §§ 16-14-3(5)(A)(vi), 16-5-46.

196.   "Sexual Servitude" means any sexually explicit conduct or performance

involving sexually explicit conduct that is induced or obtained by coercion or

deception or from an individual who is under the age of 18 years and for

which anything of value is directly or indirectly given, promised to, or

received by any individual.  O.C.G.A. § 16-5-46(a)(8)(A), (B).

197.   A person violates O.C.G.A § 16-5-46(c)(1) when they knowingly subject

an individual to or maintain an individual in sexual servitude.  Plaintiffs and

other victims were subjected to and maintained in sexual servitude in

violation of O.C.G.A. § 16-5-46(c)(1) when sex traffickers coerced them into

sexually explicit conduct for which something of value, directly or indirectly, was given, promised to, or received by someone.

198.   Defendants ESA, Inc., ESA Management and HVM violated O.C.G.A § 16-5-46(c)(1) at the ESA Atlanta locations when, acting through employees, they aided and abetted sex traffickers by serving as lookouts for them, warning the traffickers of police activity, guest complaints, and buyer activity so intensive that it was likely to attract the attention of law enforcement or cause guest complaints.  This conduct was intended to maintain victims, including Plaintiffs R.K., and T.H., persons then under the age of 18 years, and Plaintiffs C.A. and K.P. in sexual servitude by preventing their sexual servitude from coming to the attention of law enforcement and preventing the victims from being rescued, so that the traffickers, ESA, Inc., ESA Management and HVM could continue to make money from their sexual servitude.

199.   A person violates O.C.G.A § 16-5-46(c)(2) when they knowingly recruit, entice, harbor, transport, provide, solicit, patronize, or obtain by any means an individual for the purpose of sexual servitude.

200.   Defendants ESA, Inc., ESA Management and HVM violated O.C.G.A §§ 16-5-46(c)(2) and 16-5-46(c)(3) at the ESA Atlanta locations when, acting through employees, they aided and abetted traffickers who, in turn, knowingly benefited financially and received things of value from the sexual

57

servitude of Plaintiffs and others.  More specifically, ESA Management and HVM aided and abetted traffickers by serving as lookouts for them, warning the traffickers of police activity, guest complaints, and buyer activity so intensive that it was likely to attract the attention of law enforcement or cause guest complaints.  This conduct was intended to prevent the trafficking from coming to the attention of law enforcement and to prevent victims, including Plaintiffs C.A., K.P., R.K. and T.H., from being rescued, so that the traffickers, ESA, Inc., ESA Management and HVM could continue to make money by harboring and providing Plaintiffs and other victims for the purpose of sexual servitude.  Through their conduct, ESA, Inc., ESA Management and HVM maximized the financial benefit derived from the sexual servitude of these Plaintiffs and other victims, both for the traffickers and for themselves.

201.  Defendant ESA, Inc., ESA Management and HVM also violated O.C.G.A § 16-5-46(c)(2) at the ESA Atlanta locations when they harbored Plaintiffs R.K. and T.H., persons then under the age of 18 years, and Plaintiffs C.A. and K.P. as well as other victims, for the purpose of sexual servitude.

202.  A person violates O.C.G.A § 16-5-46(c)(3) when they knowingly benefit financially or by receiving anything of value from the sexual servitude of another.

203.   Defendants ESA, Inc., ESA Management and HVM violated O.C.G.A. § 16-5-46(c)(3) when they knowingly benefited financially and by receiving things of value from the sexual servitude of Plaintiffs R.K. and T.H., persons then under the age of 18 years, and Plaintiffs C.A. and K.P., as well as others, occurring at the ESA Atlanta locations.

204.   Defendants' agents performed conduct which is an element of the violations of O.C.G.A. § 16-5-46 alleged above while acting within the scope of their office or employment and on behalf of Defendants.  The conduct of Defendants' agents constituted a pattern of illegal activity that one or more agents of each Defendant knew or should have known was occurring and that Defendants repeatedly ratified and confirmed.

### B.     The acts of racketeering activity formed a pattern.

205.   Defendants ESA, Inc., ESA Management and HVM each engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions.

206.   Each violation of O.C.G.A. § 16-5-46(c) by Defendants ESA, Inc., ESA Management and HVM constitutes a separate offense that does not merge with any other offense.  O.C.G.A. § 16-5-46(i).

207.   Each rental of an individual room to a sex trafficker for the purpose of offering seclusion or shelter for the practice of prostitution constitutes a separate act of racketeering activity.

208.   Each act of aiding and abetting prostitution constitutes a separate act of racketeering activity.

209.   Each act of aiding and abetting pimping constitutes a separate act of racketing activity.

210.   The acts of racketeering activity engaged in and aided and abetted by Defendants were interrelated by distinguishing characteristics and were not isolated incidents.

211.   As to each of the Defendants the acts of racketeering in which they engaged or which they and aided and abetted were interrelated by distinguishing characteristics, including but not limited to:

    a.    commercial sex taking place with a high degree of frequency over the course of several years at hotels owned by Defendant ESA, Inc. through a subsidiary, managed by Defendant ESA Management or Defendant HVM;

    b.    commercial sex taking place with a high degree of frequency over the course of several years at hotels owned by Defendant ESA, Inc. through a subsidiary, managed by Defendant ESA Management or Defendant HVM was ostensibly responsible for the location's management;

c.     deriving financial benefit by renting rooms to traffickers knowing that those traffickers were engaged in sexual servitude, pimping and prostitution;

d.     warning sex traffickers when law enforcement was present or making inquiries, thereby reducing the likelihood that the trafficking would be detected and the Plaintiffs and other victims would be rescued;

e.     warning sex traffickers when guests complained about their activities, thereby reducing the likelihood that the trafficking would be reported to law enforcement and Plaintiffs and other victims would be rescued; and

f.     the involvement of Defendants ESA, Inc., ESA Management and HVM in racketeering activity including sex trafficking, keeping a place of prostitution, pimping and prostitution at both the ESA Atlanta locations and ESA-Baton Rouge.

212.  As to each of the Defendants, the acts of racketeering had the same or similar intents, including but not limited to acquiring money, directly or indirectly, through a pattern of racketeering activity.

213.  As to each of the Defendants, the acts of racketeering had the same or similar results, in that they did acquire money or facilitate the acquiring of money, directly or indirectly, through a pattern of racketeering activity.

214.   As to each of the Defendants, the acts of racketeering had the same or similar accomplices, including but not limited to hotel employees, corporate employees, and sex traffickers.

215.   As to each of the Defendants, the acts of racketeering had the same or similar victims, including Plaintiff C.A., K.P., R.K. and T.H., and others, who were forced to engage in sexual acts in exchange for money at Defendants' hotels.

216.   As to each of the Defendants, the acts of racketeering had the same or similar methods of commission, including but not limited to employees acting as lookouts for sex traffickers, shielding the traffickers' activities from detection by law enforcement and preventing the rescue of Plaintiffs C.A., K.P., R.K. and T.H. and other victims, thereby harboring, holding, confining, and detaining persons who were forced to engage in sexual acts in exchange for money at Defendants' hotels and ratifying such conduct by their employees and agents.

## II.   NUMBERED COUNTS

### COUNT I
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(a)
(Plaintiffs C.A., K.P., R.K. and T.H., Against Defendants ESA, Inc., ESA Management and HVM)

217.   Plaintiffs C.A., K.P., R.K. and T.H., repeat and incorporate the

allegations set forth in ¶¶ 19–186, above, as if fully set forth herein.

218.   As set forth above in ¶¶ 187–216 above, Defendants ESA, Inc., ESA Management and HVM violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in or control of personal property, including money, through a pattern of racketeering activity.

219.   The conduct in violation of the Georgia RICO Act in which Defendants ESA, Inc. and ESA Management participated continued to within five years of the filing of this action. In addition, ESA Management has assumed liability for HVM's conduct in violation of the Georgia RICO Act.

220.   Upon information and belief, the conduct of Defendants ESA, Inc., and ESA Management in violation of O.C.G.A. § 16-14-4 has not terminated.

221.   Plaintiffs C.A., K.P., R.K., and T.H. have suffered substantial physical, emotional, and psychological harm, as well as other injuries as a direct and proximate result of the acts of racketeering activity and violations of Georgia RICO committed by Defendants ESA, Inc., ESA Management and HVM.

222.   Defendants ESA, Inc., ESA Management and HVM are liable to Plaintiffs C.A., K.P., R.K., and T.H. for three times their damages in an amount to be proven at trial, their attorneys' fees, and their costs of investigation and litigation.

223.   The wrongful actions of Defendants ESA, Inc., ESA Management and HVM constitute willful misconduct, malice, fraud, wantonness, oppression, or

that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

224.   Because Defendants ESA, Inc., ESA Management and HVM acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT II**
**Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(c)**
**(Plaintiffs C.A., K.P., R.K., and T.H. Against Defendants ESA, Inc., and ESA Management and HVM)**

225.   Plaintiffs C.A., K.P., R.K., and T.H. repeat and incorporate the allegations set forth in ¶¶ 19–216, above, as if fully set forth herein.

226.   Defendants ESA, Inc., ESA Management and HVM violated O.C.G.A. § 16-14-4(c) by conspiring with their employees to acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

227.   Defendants ESA, Inc., ESA Management, and HVM, as well as their employees, knowingly and willfully joined a conspiracy involving a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained. More specifically, this conspiracy involved making money by operating the

ESA Atlanta locations and ESA-Baton Rouge as a venue for sexual servitude, prostitution, and pimping.

228.   Defendants ESA, Inc., ESA Management, and HVM committed acts of racketeering activity and overt acts in furtherance of the ESA Sex Trafficking Conspiracy, including those alleged above.

229.   The predicate acts and overt acts committed by the participants in the ESA Sex Trafficking Conspiracy, number in the thousands and took place over nearly a decade.

230.   The conduct in violation of the Georgia RICO Act in which Defendants ESA, Inc. and ESA Management participated by committing acts of racketeering activity or overt acts continued to within five years of the filing of this action.

231.   Upon information and belief, the conduct of Defendants ESA, Inc., ESA Management, and their employees in violation of O.C.G.A. § 16-14-4 has not terminated.

232.   Plaintiffs C.A., K.P., R.K., and T.H. have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the acts of racketeering activity and other conduct in violation of Georgia RICO committed by Defendants ESA, Inc., ESA Management, HVM and their employees.

233.   Defendants ESA, Inc., ESA Management, and HVM are liable to Plaintiffs C.A., K.P., R.K., and T.H. for three times their damages in an amount to be proven at trial, their attorneys' fees, and the costs of investigation and litigation.

234.   The wrongful actions of Defendants ESA, Inc., ESA Management, and HVM constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs C.A., K.P., R.K., and T.H. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

235.   Because Defendants ESA, Inc., ESA Management, and HVM acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

### COUNT III
### TVPRA, 18 U.S.C. § 1595
### (Plaintiffs C.A., K.P., R.K., and T.H. Against
### Defendants ESA, Inc., ESA Management and HVM)

236.   Plaintiffs repeat and incorporate the allegations set forth in ¶¶ 19–186 above, as if fully set forth herein.

237.   In violation of 18 U.S.C. § 1595(a), each Defendant—ESA, Inc., ESA Management and HVM—knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking.

## Direct Liability

238.   Defendants are each directly liable to each Plaintiff under 18 U.S.C. § 1595(a) because they each knowingly benefited from participation in a venture that each Defendant knew or should have known violated 18 U.S.C. § 1591.

239.   Defendants each knowingly participated in a venture that operated the ESA Atlanta locations and ESA-Baton Rouge.  This venture, which Plaintiffs call the "ESA Venture," included not only the Defendants but also their employees, including employees who were complicit in and supported, assisted, and/or facilitated trafficking at the location, as well as those employees who turned a blind eye to Plaintiffs' sex trafficking.

240.   The ESA Venture was in or affecting interstate commerce.

241.   Defendants were associated in fact and assumed the risk of operating the ESA Atlanta locations, the ESA-Baton Rouge, and the ESA Venture.  The Defendants participated in the ESA Venture by, among other things, operating the ESA Atlanta locations and the ESA-Baton Rouge hotels.

242.   ESA, Inc. participated in the ESA Venture at all relevant times by, among other things, owning the hotel and property and managing and operating the ESA Atlanta locations and the ESA-Baton Rouge through HVM and ESA Management, both which ESA, Inc. owned and controlled.  ESA,

Inc., through its other subsidiaries, contracted with HVM and ESA Management via a management agreement.

243.   HVM participated in the ESA Venture from at least 2009 through 2013 by, among other things, managing the ESA Atlanta locations and the ESA-Baton Rouge.

244.   ESA Management participated in the ESA Venture from at least 2013 through  at least 2017 by, among other things, managing the ESA Atlanta locations and the ESA-Baton Rouge.

245.   HVM participated in the ESA Venture from at least 2009 through 2013 by, among other things, employing the staff at the ESA Atlanta locations and the ESA-Baton Rouge.

246.   ESA Management participated in the ESA Venture from at least 2013 through  at least 2017 by, among other things, employing the staff at the ESA Atlanta location and the ESA-Baton Rouge.

247.   From at least 2009 through at least 2017, the ESA Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator.  For example—and at a minimum—the complicit hotel employees who acted as lookouts for the persons who trafficked Plaintiffs, as well as for other traffickers, and who facilitated trafficking at the location could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

248.   From at least 2009 to 2013, HVM was the employer of the hotel employees at the ESA Atlanta locations and the ESA-Baton Rouge, including hotel employees who acted as lookouts for the persons who trafficked Plaintiffs, as well as for other traffickers, and who facilitated trafficking at those hotels.  Therefore, HVM directly participated in acts of trafficking in violation of § 1591.

249.   From at least 2013 to at least 2017, ESA Management was the employer of the hotel employees at the ESA Atlanta locations and the ESA-Baton Rouge, including hotel employees who acted as lookouts for the persons who trafficked Plaintiffs, as well as for other traffickers, and who facilitated trafficking at those hotels.  Therefore, ESA Management directly participated in acts of trafficking in violation of § 1591.

250.   As to Plaintiffs C.A., K.P., R.K. and T.H. at least one of the participants in the ESA Venture facilitated Plaintiffs' trafficking at the ESA Atlanta locations and ESA-Baton Rouge knowing—or acting with reckless disregard for the likelihood—that the Plaintiffs' traffickers were employing means of force, threats of force, fraud, coercion, or some combination thereof to cause Plaintiffs to engage in commercial sex.

251.   As to Plaintiffs R.K. and T.H., at least one of the participants in the ESA Venture facilitated Plaintiff R.K.'s and T.H.'s trafficking at the ESA Atlanta locations and ESA-Baton Rouge knowing—or acting with reckless

disregard for the likelihood—that Plaintiff R.K.'s and T.H.'s trafficker would cause her to engage in commercial sex.

252.   Further, at least one of the participants in the ESA Venture had a reasonable opportunity to observe Plaintiff R.K. and T.H. while they were being trafficked at the ESA Atlanta locations and ESA-Baton Rouge.

253.   In the course of the ESA Venture, hundreds of buyers paid to have sex with Plaintiffs at the ESA Atlanta locations and ESA-Baton Rouge.

254.   The Defendants knew that they were participating in a venture—the ESA Venture—and they knew or should have known that the ESA Venture violated the TVPRA because the Defendants (and their agents and representatives) saw the signs of sex trafficking exhibited by Plaintiffs, their traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of hundreds of male buyers to Plaintiffs' rooms, and the numerous other victims being trafficked at the hotel.

255.   Furthermore, both HVM and ESA Management had direct knowledge of Plaintiffs' trafficking because of their complicit employees who, among other things, acted as lookouts for the persons who trafficked Plaintiffs, as well as for other traffickers, and who participated in acts of trafficking in violation of § 1591.

256.   Based on the facts alleged in ¶¶ 36–186  above, and incorporated here by reference, ESA, Inc., HVM (from at least 2009 through 2013, during the

time ESA, Inc. owned and HVM managed the location), and ESA

Management (from 2013 to present, during the time ESA, Inc., owned and

ESA Management managed the location) knew or should have known about

sex trafficking at the ESA Atlanta locations and ESA-Baton Rouge

257.   Defendants each knowingly benefited from the ESA Venture by

receiving a percentage of the revenue generated by the operation of the ESA

Atlanta locations and ESA-Baton Rouge hotels.

## Vicarious Liability

258.   Alternatively, ESA, Inc. is vicariously liable under the TVPRA under

the same theories outlined above because their control of operations at the

ESA Atlanta locations and ESA-Baton Rouge exceeded imposing uniformity

in brand standards and instead extended to controlling the day-to-day

operations of the hotels and the venture that caused Plaintiffs' harm.

259.   From at least 2009 through 2013, ESA, Inc. ultimately controlled the

day-to-day operation of ESA Atlanta locations and ESA-Baton Rouge,

notwithstanding the ostensible involvement of HVM, as set out above in

¶¶ 27–35.  Based on this control, ESA, Inc. is vicariously liable for the actions

of HVM in violation of the TVPRA as alleged above in ¶¶ 236–257.

260.   From at least 2009 through 2013, ESA, Inc. was the principal and

controlled the actions of its agent, HVM.  Accordingly, ESA, Inc. is vicariously

liable for the actions of HVM in violation of the TVPRA as alleged above in

¶¶ 236–257.

261.   From at least 2009 through 2013, ESA, Inc. was the principal and controlled the actions of HVM.  Accordingly, ESA, Inc. is vicariously liable for the actions of HVM in violation of the TVPRA as alleged above in ¶¶ 443–71.

262.   From at least 2013 through at least 2017, ESA, Inc. ultimately controlled the day-to-day operation of the location, notwithstanding the ownership and ostensible management and operation of ESA Management, as set out above in ¶¶ 27–35.  Based on this control, ESA, Inc. is vicariously liable for the actions of ESA Management in violation of the TVPRA as alleged above in ¶¶ 236–257.

263.   From at least 2013 through at least 2017, ESA, Inc. was the principal and controlled the actions of its agent, ESA Management.  Accordingly, ESA, Inc. is vicariously liable for the actions of ESA Management in violation of the TVPRA as alleged above in ¶¶ 236–257.

## Damages

264.   Plaintiffs have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Defendants' conduct and their participation in the sex trafficking ventures at the ESA Atlanta locations and ESA-Baton Rouge.

265.   The Defendants are liable to Plaintiffs for their damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA

and punitive damages.

266.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs.

**COUNT IV**
**Negligence**
**(Plaintiffs C.A., K.P., R.K., and T.H. Against**
**Defendants ESA, Inc., ESA Management and HVM)**

267.   Plaintiffs repeat and incorporate the allegations set forth in ¶¶ 36–186 above, as if fully set forth herein.

268.   At all relevant times, ESA, Inc. owned and controlled the ESA Atlanta locations and ESA-Baton Rouge hotels through subsidiaries.  Because of its ownership of the locations, ESA, Inc. had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

269.   From at least 2009 through 2013 HVM—and ESA, Inc., which owned and controlled HVM—managed the ESA Atlanta locations and ESA-Baton Rouge.  Because of their management, ESA, Inc. and HVM had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

270.   From at least 2013 through at least 2017, ESA Management—and ESA, Inc., which owned and controlled ESA Management—managed the ESA Atlanta locations and ESA-Baton Rouge.  Because of their management,

ESA, Inc. and ESA Management had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

271.   From at least 2009 through 2013 HVM—and ESA, Inc., which owned and controlled HVM—imposed the operating requirements and controlled the operation of the ESA Atlanta locations and ESA-Baton Rouge.  HVM also employed the employees who worked at the ESA Atlanta locations and ESA-Baton Rouge in this time.  Because of their operation of and control over the locations, both ESA, Inc. and HVM had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

272.   From at least 2013 through at least 2017, ESA Management—and ESA, Inc., which owned and controlled ESA Management—imposed the operating requirements and controlled the operation of the ESA Atlanta locations and ESA-Baton Rouge.  ESA Management also employed the employees who worked at the ESA Atlanta locations and ESA-Baton Rouge in this time.  Because of their operation of and control over the locations, both ESA, Inc. and ESA Management had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

273.   From 2009 through 2013, Plaintiffs C.A., K.P., R.K. and T.H. were invitees of ESA Atlanta locations and ESA Baton Rouge to whom ESA, Inc. and HVM owed a duty of care to keep those hotels safe from unlawful acts on their premises.

274.   From 2013 through 2017, Plaintiffs C.A., K.P., and R.K. were invitees of ESA Atlanta locations and ESA Baton Rouge to whom ESA, Inc. and ESA Management owed a duty of care to keep those hotels safe from unlawful acts on their premises.

275.   From at least 2009 through 2013, Defendants ESA, Inc. and HVM had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the ESA Atlanta locations and ESA-Baton Rouge.

276.   From at least 2013 through at least 2017, Defendants ESA, Inc. and ESA Management had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the ESA Atlanta locations and ESA-Baton Rouge.

277.   From at least 2009 through 2013 Defendants ESA, Inc. and HVM negligently failed to keep the ESA Atlanta locations and ESA-Baton Rouge safe and negligently failed to protect their invitees, including Plaintiffs C.A., K.P., R.K., and T.H. in breach of their duty of care.

278.    From at least 2013 through at least 2017, Defendants ESA, Inc. and ESA Management negligently failed to keep the ESA Atlanta locations and ESA-Baton Rouge safe and negligently failed to protect their invitees, including Plaintiffs C.A., K.P., an R.K. in breach of their duty of care.

279.   Defendants were negligent, and their negligence proximately caused Plaintiffs' injuries by:

a.   Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

b.   Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

c.   Negligently failing to provide appropriate and effective security personnel during Plaintiffs' trafficking at the hotel;

d.   Negligently failing to properly inspect and maintain the premises;

e.   Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

f.   Negligently failing to properly retain, hire, train, and supervise said employees;

g.   Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h.   Negligently failing to inspect, patrol, or appropriately monitor the property;

i.   Negligently failing to remediate a long history of crime at the ESA Atlanta locations and ESA-Baton Rouge and the area nearby;

j.    Negligently failing to warn invitees of known hazards at the property; and

k.    Negligently representing to invitees that the property was safe.

280.  From 2009 through 2013, Defendants ESA, Inc. and HVM each had a duty to keep the premises safe for guests and invitees, including Plaintiffs C.A., K.P., R.K. and T.H.  Based on the facts alleged in ¶¶ 36–186  above, and incorporated here by reference, Defendants ESA, Inc. and HVM each had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the ESA Atlanta locations and ESA-Baton Rouge.  Despite their actual and constructive knowledge, Defendants ESA, Inc. and HVM negligently failed to protect invitees, including Plaintiffs C.A., K.P., R.K. and T.H. from the risks of sex trafficking.

281.  From 2013 through 2017, Defendants ESA, Inc. and ESA Management each had a duty to keep the premises safe for guests and invitees, including Plaintiffs C.A., K.P., and R.K.  Based on the facts alleged in ¶¶ 36–186 above, and incorporated here by reference, Defendants ESA, Inc. and ESA Management each had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the ESA Atlanta locations and ESA-Baton Rouge.  Despite their actual and constructive knowledge, Defendants ESA, Inc. and ESA Management

negligently failed to protect invitees, including Plaintiffs C.A., K.P., and R.K. and from the risks of sex trafficking.

282.   Through their negligence, Defendants each created and contributed to the circumstances that permitted, enabled, and encouraged Plaintiffs' traffickers to operate at their locations.  Defendants each had the power and authority to prevent Plaintiffs' trafficking through numerous means, including but not limited to using do-not-rent lists, reporting Plaintiffs' traffickers to law enforcement (as they did with other criminal entities), and establishing various security measure and other policies to prevent commercial sex and commercial sex trafficking at their hotels.  Defendants' failure to act with reasonable care in response to the foreseeable risk of commercial sex trafficking caused Plaintiffs' injuries.

283.   As a direct and proximate result of the actions and/or inactions of Defendants, Plaintiffs suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

284.   Alternatively or in addition to the above, ESA, Inc. is vicariously liable for the negligence of HVM and the damages caused to Plaintiffs C.A., K.P., R.K. and T.H. thereby from at least 2009 through 2013 because ESA, Inc. controlled the actions and operations of HVM, as set out above in ¶¶ 27–35, such that HVM was an agent of ESA, Inc., its principal.

285.   Alternatively or in addition to the above, ESA, Inc. is vicariously liable for the negligence of ESA Management and the damages caused to Plaintiffs C.A., K.P., and R.K. thereby from at least 2013 through 2017 because ESA, Inc., controlled the actions and operations of ESA Management, as set out above in ¶¶ 27–35, such that ESA Management was an agent of ESA, Inc., its principal.

286.   The wrongful actions of Defendants as related to the ESA Atlanta locations and ESA-Baton Rouge, constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

287.   Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

288.   The actions of Defendants evidenced a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs undue expense. Thus, Plaintiffs are entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

## III.   ADDITIONAL THEORIES OF RECOVERY

## ALTER EGO

289.   Under Georgia law, any judgment against ESA Management or HVM shall be recoverable against ESA, Inc. because ESA, Inc. is the alter ego of HVM and ESA Management.

290.   HVM and ESA Management were created by ESA, Inc. and share the same office as ESA, Inc.

291.   From at least 2009 through 2013, as to the ESA Atlanta locations and ESA-Baton Rouge:

a.   ESA, Inc. exerted complete control over HVM's finances, policies, and business practices as to the ESA Atlanta locations and ESA-Baton Rouge;

b.   HVM employees conducted all the business of ESA, Inc. as to the ESA Atlanta locations and ESA-Baton Rouge;

c.   ESA, Inc. controlled the means and methods of how HVM conducted any business related to the ESA Atlanta locations and ESA-Baton Rouge;

d.   ESA, Inc.'s control over HVM was used to allow ESA, Inc. to profit from sex trafficking, including that of Plaintiffs at the ESA Atlanta locations and ESA-Baton Rouge, while attempting to avoid liability for doing so.

292.   From at least 2013 through at least 2017, as to the ESA Atlanta

locations and ESA-Baton Rouge:

      a.    ESA, Inc. exerted complete control over ESA Management

            finances, policies, and business practices as to the ESA Atlanta

            locations and ESA-Baton Rouge;

      b.     ESA Management employees conducted all the business of ESA,

            Inc. as to the ESA Atlanta locations and ESA-Baton Rouge;

      c.    ESA, Inc. controlled the means and methods of how ESA

            Management conducted any business related to the ESA Atlanta

            locations and ESA-Baton Rouge;

      d.    ESA, Inc.'s control over ESA Management was used to allow

            ESA, Inc. to profit from sex trafficking, including that of

            Plaintiffs at the ESA Atlanta locations and ESA-Baton Rouge,

            while attempting to avoid liability for doing so.

## JOINT VENTURE

293.   Under Georgia law, any judgment against HVM relating to their

conduct at the ESA Atlanta locations and ESA-Baton Rouge shall be

recoverable against ESA, Inc. because ESA, Inc. was engaged in a joint

venture at the ESA Atlanta locations and ESA-Baton Rouge with HVM and

each is liable for the acts and omissions of the other.

294.   From at least 2009 through 2013,

a.   the ESA Atlanta locations and ESA-Baton Rouge was a joint undertaking for profit that included ESA, Inc. and HVM;

b.   ESA, Inc. and HVM exerted collective control over, and each had a right of control over, the ESA Atlanta locations and ESA-Baton Rouge; and

c.   ESA, Inc. and HVM had joint proprietary interests in the ESA Atlanta locations such that they each shared in the profits and losses of the hotels.

295.   Under Georgia law, any judgment against ESA Management relating to their conduct at the ESA Atlanta locations and ESA-Baton Rouge shall be recoverable against ESA, Inc. because ESA, Inc. was engaged in a joint venture at the ESA Atlanta locations and ESA-Baton Rouge with ESA Management and each is liable for the acts and omissions of the other.

296.   From at least 2013 through at least 2017,

a.   the ESA Atlanta locations and ESA-Baton Rouge was a joint undertaking for profit that included ESA, Inc. and ESA Management;

b.   ESA, Inc. and ESA Management exerted collective control over, and each had a right of control over, the ESA Atlanta locations and ESA-Baton Rouge; and

    c.      ESA, Inc. and ESA Management had joint proprietary interests in the ESA Atlanta locations and ESA-Baton Rouge such that they each shared in the profits and losses of the hotels.

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendants for the following:

    a.      Process issue as provided by law;

    b.      Actual damages in amounts to be shown at trial from the Defendants;

    c.      All general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

    d.      A trial by jury; and

    e.      Such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 5th day of March, 2021.

    */s/ John E. Floyd*
    John E. Floyd
    Georgia Bar No. 266413
    floyd@bmelaw.com
    Tiana S. Mykkeltvedt
    Georgia Bar No. 533512
    mykketlvedt@bmelaw.com
    Manoj S. Varghese
    Georgia Bar No. 734668

varghese@bmelaw.com
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com
Michael R. Baumrind
Georgia Bar No. 960296
baumrind@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, GA  30309
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile